19-217-4. Mr. Fernandez, you may proceed. Thank you, Your Honor. Your Honors, Ms. Ramos-Burciaga did not give clear and unequivocal consent, the sort that's required that the government prove. Her actions, her words, were no more than a submission to HRSA.  In the final crucial moments, the moments in which she was being directed to move things in her own bag, when Agent Perry described the interaction as not a search, as simply a request for her to do things, she was merely moving and cooperating with Agent Perry. And you could hear it in his voice. Agent Perry became increasingly directive, he became increasingly intrusive, and his voice became more pressured. When Ms. Ramos-Burciaga moved that final item so that Agent Perry can see what he was after, what he was looking for the entire time, she was cooperating with directives from Agent Perry. Your Honors, cooperation is not consent. The government in this appeal has made a significant deal about the various factors that this court and the Supreme Court has issued in weighing whether or not in the totality of circumstances, consent was freely and voluntarily given. Mr. Fernandez, you talked about the tone of Officer Perry. If we were to accept your argument on that, that his tone was as you described it, wouldn't we have to find that there was clear error by the district court in its factual findings on that? Your Honor, the entire inquiry before this court is a question of clear error. Whether or not voluntariness, once voluntariness is found by the district court, the Court of Appeals has to find clear error because even though it's a mixed question of fact and law, the Court of Appeals has, Your Honor's court has found that it is a question of clear error. Clear factual error is what we have to decide here. Yes. Okay. Thank you. And Your Honor, I would point out that it is clear error. I would encourage Your Honors to find that there is clear error, especially with respect to tone. The tone of Agent Perry certainly sounds congenial and cordial at the outset, and it continues that way for some time. But the interaction goes on for many more minutes than one or two. In the seminal cases like Drayton, some of the cases that the government cites like Broomfield, the interaction is brief, about one minute long, sometimes two. It's a single question, often a single response. Sure, you can check my baggage. This was a prolonged interaction. And in that prolonged interaction, you could hear a marked change in Agent Perry's voice, his pressure, his intonation, and it changes right when he searches Ms. Ramos-Burciaga's luggage and finds nothing. When he searches her, there's two pieces of luggage involved in this case. There's like a rolling suitcase, and then there's the backpack. Agent Perry searches the rolling suitcase and doesn't find anything. And at that point, he becomes dismissive. He starts speaking more quickly. When Ms. Ramos-Burciaga says, you know, what's wrong? I'm afraid now. I'm nervous. Agent Perry runs roughshod over her clear hesitation to continue the interaction. Did your client testify at the suppression hearing? Yes, Your Honor. And Officer Perry did, correct? Yes. And I think there was some debate or conflicting testimony about body language. And she said the body language was coercive, for want of a better word. And the officer said otherwise, to some extent. And the district court, this is similar to Judge Murphy's question, the district court found that the officer was more credible on that piece. So, you know, of course we have the audio and we can listen, but as I understand or interpret the district court's order, he's saying that there was no coercive type, you know, body language that wouldn't be captured by the audio in this case. Don't we have to defer to that somewhat on this clear error point? Well, deference, Your Honor, is appropriate given that the standard is clear error. But Your Honor, I would find, I would ask again that you find that this to be clear error because although Your Honor sort of set up a juxtaposition between Ms. Ramos-Burciaga's testimony and Agent Perry's. Agent Perry doesn't argue that, he doesn't say anything really in his testimony about what body language he was using. He describes where he was standing. There was exhibits introduced to show what the area looked like and where his partner was standing. And he describes distance. But it was only Ms. Ramos-Burciaga who described body movements that she perceived, and I would argue a reasonable person would perceive as coercive. Was the agent questioned about body language and what he was doing and how he acted? Absolutely. On direct, he was asked to describe where he stood, whether or not he touched her. And it's uncontroverted. He didn't make any physical connection with her. But what Ms. Ramos-Burciaga describes and which couldn't have been caught on an audio, on an audio tape, and that's why I think, that's why I'm arguing it is clear error. Because ultimately, the trial court found, based on just an audio tape, that the tone of Agent Perry was inconsistent with coercive body language, which is sort of a, it's an odd finding that we never, not just odd, it's just unsupported by the facts and the record, that we would find body language not being coercive based on the tone of the audio. It was only Ms. Ramos-Burciaga that testified in clear and uncontroverted testimony that things that Agent Perry did was coercive. For instance, putting his palm out when saying, can I search that backpack or what about the backpack? It was a clear invitation to not say no when a palm of an officer is in your hand and demonstrating his interest in searching. Also, she describes his hands all but inside the backpack when he was directing her as to where to move items, where to take items out from. But does he testify that he did not put his hands in the backpack? And that's why I try to be careful, Your Honor, by saying all but inside. His hands, even according to Ms. Ramos-Burciaga, were not inside the backpack. But he was pointing, he was gesturing in such a way that Ms. Ramos-Burciaga under no uncertain terms understood that she had to do what he was asking her to do. And again, she cooperated. When she was asked, can I search that, she did say, sure. But what you can hear in her voice is resignation. What you can hear her doing was following the orders, following the direction of Agent Perry. It certainly wasn't the sort of free will, the sort of voluntary actions of someone who is merely expressing their own desire to have their bag searched. And that is the standard, whether or not it's clearly unequivocally consent and whether it's voluntary. Is Your Honor Murphy about to ask a question? Sorry. I was. Essentially, your view is because the only evidence on body language, at least conclusory evidence, came from your client, that was the only evidence and therefore the court had to find factually in her favor on that. Isn't that essentially what you're saying? Your Honor, I would make the distinction which is that the trial court could have said I found her testimony unreliable and not credible, but the trial court didn't do that. The trial court weighed various factors that it believed it had in front of it and then came to what we're arguing is an unsupported conclusion. The trial court did not find that Ms. Ramos-Burciaga was incredible. I just said that her perception or her description of body language was inconsistent from the tone that Agent Perry had on the audio. And those two things are, if not inconsistent, a leap from tone on an audio to uncontroverted evidence of body language. But all Perry could have testified to was what he testified to, and that is where his hands were, where his body was, what he did. That's all he could testify to. He couldn't say anything else, right? I think that's right. Because there wouldn't have been an objection if there was a question, you know, was your body language intimidating? Right. I would have objected on the ground that it was forming a legal conclusion. That's right. They had all the facts that they could have in front of them. And under a clear error standard, don't we have to accept that the district court found the facts in accordance with the testimony of Perry and determined, concluded, that those were not intimidating? Is that a wrong approach? It's not wrong, Your Honor. I think it's incomplete in the sense that Your Honor can still find that it was clear because there was much better testimony, much better evidence before it. Rather than audio and this tone of voice on an audio recording, there was uncontroverted evidence of someone describing what they were perceiving and how they took it. And even though the subjective understanding of Ms. Ramos-Burciaga is not conclusive, it is a factor in the totality of the circumstances. There was nothing about her perception that seemed unreasonable. Your Honor, I would also point out, however, that it's just one of many factors to be considered, whether or not gestures or body language were coercive. Your Honor, do you think there was something about the bus station location that made this encounter more coercive than, say, a street encounter? I think it's hard to say. No, I would say no. It was a situation in which the physical location was less important than how Agent Perry was acting. I would say it was more coercive in the sense that when Agent Perry described himself as being there for security, that it was a bus station becomes incredibly important. Because on a street encounter, being there for security, one can say, well, I'm not trying to do anything that requires me to go through security. No, thank you. I'm going to go about my business. But in a bus station where we are enculturated and we are conditioned to know that travel, whether it be by train, bus, or plane, often carries the condition of going through a security check. That becomes incredibly important in the calculus of coercion. So, yes, Your Honor, I think Your Honor's question can be construed in two ways. In one way, bus station, is it any more public or is it any less public or is it any more coercive by nature of being a bus station than a street? Probably not. But when coupled with the questions and the answers that Agent Perry was giving to Ms. Ramos-Burciaga's questions, then yes, it does become much more coercive. Because saying you're there for a security purpose indicates to any reasonable passenger, any reasonable person trying to get on any sort of conveyance, that they have to submit to that sort of check. Because security in our society, at least for the last decade, has been paramount. And Your Honor's… Were they uniformed? Was Perry uniformed? No, Your Honor. He was in plain clothes. His gun wasn't showing. There's all sorts of things that the factors say were not per se coercive. But I would argue, Your Honor, and I would ask that you consider this case in context of something more like Harrison, where it's clear that the subtlety of the coercion does not mean that coercion didn't take place. In Schneckloff, which is one of the central cases in this area, the Supreme Court was clear. It said no matter how subtle the coercion is applied, the resulting consent may still be just a pretext if there's other factors that pressure Ms. Ramos-Burciaga. In this case, I would point out the repetitive questions, and finally, that crucial moment where she was directed to do what Agent Perry asked her to do. And Your Honor, I would like to reserve the remainder of my time for rebuttal if there's no further questions at this moment. You may. Thank you. Thank you, Your Honor. Mr. Keeney? May it please the court. My name is Emil Keeney. I'm an assistant U.S. attorney in Albuquerque, New Mexico, and we are asking the court to affirm the denial of the motion to suppress. And I will go through the points that Mr. Fernandez has raised here. First of all, we think that the district court did not clearly err by finding that a defendant consented to the search. She asked why the search. When he first asked to search the backpack, the defendant asked why Agent Perry wanted to search. Agent Perry explained that to her. When she said she was nervous, he tried to allay her nervousness by explaining, referring to his prior explanations. He asked... Well, wasn't this repeated reference to security? Isn't that coercive? No, Your Honor. Not at all. There's a number of differences between the situation that the defendant was in and, say, for example, going through an airport. But what counsel has just said is significant and true, is it not? I mean, the level of security that is placed upon all of us when we're traveling is a reality. And when someone says, wait a minute here in the bus station, we're doing a security check. Wouldn't that mean to most reasonable people that they're not going anywhere until that check is completed? No, Your Honor. We disagree with that. First of all, there's no common understanding that a bus station... You think she felt free to walk away? Well, the district court didn't make... I think she did. The district court didn't rule on it because, on this particular issue, because defendant didn't raise it below. And of course, that's one of our arguments that this whole line of argument is waived. But yes... What's waived? The security argument? Right. The only argument that defendant made below, or the only two arguments that defendant made below with respect to security were, one, that the defendant asked Agent Perry, what happened that you stopped me? And that this conveyed to Agent Perry that she felt stopped, and that by not telling her that she was free to go, and instead referring to security reasons, that she was therefore seized at that moment. He didn't make any argument like he's making in his brief or today, such as the security, any person going through an airport or a bus station would feel the need to submit to an officer's security check. The argument was not raised, and the district court didn't rule on it. But even if it had been, even if the district court ruled on it, we think it would be without merit. First of all, defendant herself testified she didn't perceive it to be as a security check. Actually, that also goes to our waiver argument. If you look at the defendant's testimony in volume three of the record, page 365 to 366, at 372, at 383 and 384, the defendant herself testified this was not like an ordinary security check. She had been through security checks before, and this was not what she was perceiving. Defendant herself argued this in a post-submission brief to the district court, and that's at volume one of the record at 225 and 232 and 233, that this was not what was happening. But there's a number of differences between airports, say, on the one hand and bus stations on the other. So, for example, first of all, Agent Perry and his colleagues were not in uniform. They were not displaying weapons. If you go to a security check at the airport, they're in uniform, weapons are displayed. There was no physical channeling of anyone through any kind of security check at the bus station. In fact, Agent Perry explained to defendant that at the bus station, it's different because Greyhound doesn't conduct security checks, and that's why we go around and talk with the passengers. He also said, we go around and talk with passengers. He didn't say, we're here to inspect passengers' luggage, we're here to search their bags, or anything like that, that would imply that she was required to comply with his directives. Well, she does say at one point, when we get to the point that he's asked to search her backpack, she says, I'm scared right now. Doesn't that indicate that she doesn't want this to happen? Well, I think she's expressing, I don't know that she explained exactly what she meant by that, but I think anyone's nervous when they're talking with a police officer. I think that's very natural. The Supreme Court and this court recognized this cases in the past. She didn't relate that to Agent Perry's remarks about security. And then Agent Perry tried to relay her concerns by saying that, as we explained before, we're here for security, we're talking to passengers at the bus station. And after that, she consented to allow him to look inside her bag. So no, I don't think that that's an indication. But even if she felt like that, of course, her subjective feeling is not what's controlling, it's whether the officer did anything, whether the objective facts are such that a reasonable person would feel compelled to consent. Were you going to ask something? Well, but there you have a reasonable person, our defendant, who is expressing that she feels afraid now. Isn't that an indication of lack of consent? No, because Agent Perry, once he explained to her what he was doing, he referred to his previous explanations. And she said, Oh, yeah, sure. I'll let you look in my bag. And I don't think it was a clear error for the district court to take it that way. I'd like to go on to the body, the gestures and body language question that has come up. I think it's important to remember that the district court wasn't just considering the audio tape. He had in front of him the defendant herself. The defendant herself made the gestures that she was talking about, mimicked them in front of the district court. He was able to see and observe what she did. And he also stated at page 279 of volume one of the record that he was considering her testimony and Agent Perry's testimony in court. He was weighing it, not just the audio recording. I think his reference to the, so, and we don't have any pictures or videotape of what those gestures were. The district court was therefore in a superior position to any of us to see and weigh their effect. I think his reference to the audio tape. I think that's a I think what that recognizes is that the audio, the tone with which a gesture is accompanied can affect the import of the gesture. It can affect, it can help determine its effect. So, for example, if I say to one of you, if I point to one of you and say, Judge, that was a funny joke. That's a different sort of meaning than, say, if you were a child and I was your father and said, young man, young lady, get to your room. I think that he was considering the effect of both the gestures, which he could see and we cannot, as well as the audio tape. I don't think there's any clear error that this court can find there after considering that. You'd agree with me at some point persistence is going to cross the line into coercion. And, you know, here you have a reluctant encounter and it goes on and on and on. Once no, twice no, and then finally gives up on the third time. I mean, why isn't this kind of a three strikes and you're out situation for the officer? Well, because she didn't actually say no. She said, why? Why do you want to search? She asked for a justification and he provided, Agent Perry provided. I think it was reasonable for him to ascertain what her intent was, whether she was going to consent or not. And that was the only reason that he had to ask. And this court in an unpublished opinion called the United States versus states came to that same conclusion. Let me see. With respect to Well, I think, well, unless there are any other specific points the court wants to address. I think what we would argue is that the counter was consensual. None of the factors that this court has identified as increasing the And then for the reasons I've said before, that she, with respect to the consent to search the backpack was clear, unambiguous, specific. The district court didn't clearly err and we would ask that you affirm. Does it, does it matter whether or not this defendant was targeted by the agent? No, Your Honor, the What I think what the facts underlying this targeting claim are that The agent Perry had a list which he obtained from an informant of passengers at the bus station who are arriving on the bus from Glendale or Phoenix arriving in Albuquerque. He had the informant had underlined number of those names on that list. You can you can see the list yourself if you want to. It's a volume one of the record 350 pages 354 And the reason you want. One of the reasons he wanted to talk with defendant was that she had paid her ticket in cash. There were other passengers that you wanted to talk to And the names that were underlying those indicated passengers that had come from that destination that that is the travel itinerary is what he was looking for. And also that they paid in cash. Not every single one paid in cash, Your Honor. He explains in his testimony and that's Generally around Page 497 to 502 of volume one of the record. Although he may have talked about it outside those pages. But if you go there, you'll, you'll find it. He testified that there are there are other reasons why he might be interested in talking with someone, for example, someone had a reissued ticket. He found that significant so cash wasn't the only reason, but it was paying in cash was not the only reason, but it was a reason. And he he went and he did talk to her first, but the Supreme Court has said embossed it that approaching someone to talk to them is not easy. Police are allowed to do that. So we don't see anything here. Also, the defendant was not aware. The agent Perry had a list and that he was interested in talking with her. He never communicated that So we don't think any of the effect of that targeting would be coercive. This court is also. I'm sorry. When the backpack is being searched. You certainly get the feeling that Perry was directing her ordering her. No, move this move that so I can look there. And perhaps ordering her in such a way that that she was not truly consenting when she did that. Well, he phrased he phrased what he was saying to her in the form of question. Can you just take your stuff out of there so I can see in the bottom. Can you take this out so I can see what you have in the bottom. I can't see the bottom. I don't think it was clear error for the district court to consider those questions as questions and not as orders. Wasn't there a one point in his testimony. Well, on the tape where he said we'll move that aside in the referring to the contents of the backpack. You said yes, but can what I have here is, but can you take this out so I can see what you have in the bottom. I can't see what you're having the bottom of it. That's what he said. And we don't we think by phrasing it in the form of a question. He was asking for her permission and the district court didn't didn't earn by consider earlier by considering it as a question. John, I assume my time's almost expired. If there are no more questions we would, we would ask that you're from the district court's order. Thank you very much. Some rebuttal time for Mr Fernandez Your Honor. I'll just wait until the clock. I thank you, Your Honor. I would first address the waiver question. I would first address the waiver question. It was fully briefed and brought before the court that repeated mentions of being there for security purposes at least seven times. Although the argument was slightly tweaked on appeal referring to making specific notice of how much more significant that is in the context of travel. The trial court had adequate opportunity to consider the arguments. And so, in that way, it was preserved in terms of I believe it was Judge Briscoe's question is being targeted a factor. Absolutely, it is. And this court has found that in gains specifically that being a have particularized focus is a factor in seizure. Mr. Keeney said that the fact that there was a list was not known to Miss Ramos-Burciaga so shouldn't factor into the equation. Well, Miss Ramos-Burciaga said that she felt targeted that she was the only person he approached that he came right to her and that after two officers sandwiched her she knew that she was the focus of their attention exclusively. I know my time is out. So I appreciate your honor's time. And if there's no other questions, I will rest. I have one. Is your client still in jail? Your Honor, she was recently released after having served her sentence, but there is still a portion of her sentence, which is her supervised release portion that is still in effect. So any action by this court would have a substantive effect on her life. I wondered about that since she was arrested in 2017 and had a three year sentence. Absolutely, Your Honor. And in addition to that, you know, under PDA v. Kentucky, the immigration consequences of a conviction are certainly part and a significant part of one sentence. And she certainly suffered immigration consequences on the part of this sentence. Thank you for that clarification, counsel. Counsel, you are excused and the case shall be submitted. The court will be in recess until tomorrow morning at 830 a.m. Thank you, counsel. Appreciate your cooperation through these Zoom proceedings.